Steven and Ruth MITCHELL, et al., Appellant–Respondents,

v.

RESIDENTIAL FUNDING CORP., et al., Respondent–Appellants.

Nos. WD 70210, WD 70227, WD 70244, WD 70263.

Missouri Court of Appeals, Western District.

Nov. 23, 2010.

As Modified Feb. 1, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 1, 2011.

Application for Transfer Denied April 26, 2011.

478

482

Gene C. Schaerr, Pro Hac Vice, Kenneth L. Marshall, Counsel, Jefferson City, MO, Randolph G. Willis, Robert T. Adams, Todd W. Ruskamp, Michael K. Underhill, Robert K. Sellers, Jennifer M. McAdam, Co–Counsels, Kansas City, MO, for Respondent–Appellants.

Before THOMAS H. NEWTON, P.J., GARY D. WITT, J. and STEPHEN K. WILLCOX, Sp. J.

THOMAS H. NEWTON, Presiding Judge.

Residential Funding Company, LLC (Residential), Homecomings Financial, LLC (Homecomings), Household Finance Corp. III (Household), and Wachovia Equity Servicing (Wachovia) (collectively, "Defendants") appeal from a judgment awarding approximately $104,000,000 in compensatory and punitive damages to a class of consumers (Plaintiffs). Plaintiffs cross appeal, contesting issues of damages. We affirm the trial court's entry of judgment as to compensatory damages; reverse and remand its denial of prejudgment interest on Plaintiffs' past interest payments; reverse the punitive damages award for instructional error, and remand for a new trial as to punitive damages. Plaintiffs' motion for attorney fees on appeal is granted and remanded to the trial court to determine a reasonable amount.

## Factual and Procedural Background[1]

In November 1999, Steven and Ruth Mitchell acquired a second mortgage loan from Mortgage Capital Resource Corporation (MCR). Prior to closing on the loan, MCR mailed the Mitchells a number of documents, including: (1) a Truth–In–Lending–Act (TILA) disclosure statement,

Roy F. Walters, Counsel, Kip D. Richards, David M. Skeens, J. Michael Vaughan, Garrett M. Hodes, Co–Counsels, Kansas City, MO, for Appellant–Respondents.

1. The record in this case consisted of fifty-four volumes of legal files, over 21,000 pages, many volumes of which were filed under seal. The trial transcript was over 4,000 pages. Briefing on appeal topped 900 pages. As such, we present only a factual overview.

which stated the proposed loan amount and the interest rates; (2) a Good Faith Estimate of Settlement Charges, which listed an estimate of the closing fees; and (3) a Home Ownership and Equity Protection Act (HOEPA) disclosure statement, which stated that the loan would be subject to HOEPA. The Mitchells signed and returned the TILA and HOEPA disclosure statements. MCR sent the Mitchells a closing package, which included a United States Department of Housing and Urban Development Settlement Statement ("HUD–1A"). The HUD–1A statement provided that the Mitchells would be required to pay $3,433 in closing costs for thirteen different fees. The Mitchells signed the closing documents and returned them to MCR. The principal amount of the Mitchells' loan was $21,000 with an interest rate of 10.85%. The Mitchells financed the $3,433 in closing costs as part of the principal. MCR assessed similar types of fees for more than 300 other Missouri loans from 1998 to 2000, and in each case, the loan settlement fees were rolled into the principal.

Residential purchased the Mitchells' loan, acquiring all rights, title, and interest in the real estate deed of trust and promissory note executed by the Mitchells. Residential then conveyed the Mitchell's deed of trust and note to a trust.[2] Homecomings, a subsidiary of Residential, collected and processed the Mitchells' loan payments, as well as the other relevant payments for loans Residential purchased from MCR. Household and Wachovia en-

tered into similar agreements with MCR on Plaintiffs' loans.

The contract between Residential and MCR for the Mitchells' loan consisted of a Seller Contract and a Master Commitment Letter. The Seller Contract and Master Commitment Letter each referenced Residential's Client Guide, which set forth the terms and conditions for Residential's loan purchase requirements. The Client Guide stated that the client must comply with all state and federal laws and regulations and that Residential would purchase loans in reliance on the client's representations and compliance with the Client Guide. Residential did not independently investigate if the loans it purchased complied with state law. In their loan purchases from MCR, Wachovia and Household also did not verify whether the loans complied with state law. MCR subsequently filed for bankruptcy.

In July 2003, the Mitchells filed suit against Defendants, seeking to certify a class and claiming that MCR charged closing fees to Missouri consumers that were prohibited by Missouri's Second Mortgage Loan Act, §§ 408.231–242 ("MSMLA").[3] The Mitchells alleged that Defendants were liable under the MSMLA for "[c]harging and/or receiving, either directly or indirectly" unlawful fees prohibited by section 408.233, that Defendants were barred from collecting interest on the loans and were liable for all interest collected on the loans, and that Defendants were liable for MCR's actions as the loans' assignees. The trial court certified a class including all individuals who obtained a

2. This process is commonly known as securitization. The mortgages are pooled and "pass-through securities [are issued] to investors that represent interests in the cash flow due under the mortgages ... a business with a pool of mortgages transfers these mortgages to an unrelated entity, either a corporation or trust. The entity issues securities and the

proceeds of the mortgages are used to pay the investors." 1 John P. McNearney, *Real Estate Financing*, Mo. REAL ESTATE PRACTICE § 9.76 (MoBar Cum.Supp.2006).

3. Missouri statutory references are to RSMo 2000 and the Cumulative Supplement 2008 unless otherwise indicated.

second mortgage loan on Missouri real property from MCR on or after July 29, 1997. Out of the relevant loans that MCR originated, Residential purchased 248, Household purchased 31,[4] and Wachovia purchased 23.

Trial was held from December 3, 2007, through January 4, 2008. The trial was bifurcated—the first stage addressed liability for compensatory and punitive damages, and the second stage addressed the amount of punitive damages. At the close of Plaintiffs' case, the trial court directed a partial verdict for Plaintiffs, holding that: (1) MCR violated the MSMLA by charging illegal closing fees; and (2) Residential, Household, and Wachovia ("Assignee Defendants") were liable for MCR's violations. At the close of the liability phase, the jury found in favor of Plaintiffs and against Defendants. It awarded Plaintiffs $5,421, 706 in compensatory damages, which included compensation for the challenged fees, past interest paid on the loans, and future interest on the loans.[5] In the second phase of the trial, the jury awarded $99,000,000 in punitive damages—$92,000,000 against Residential, $4,500,000 against Household, and $2,500,000 against Wachovia.[6] All parties raised post-trial motions. The trial court subsequently reduced compensatory damages against Household, awarded the Mitchells an incentive payment from the common fund, awarded statutory attorney fees against Residential, Household, and

Wachovia, and granted Plaintiffs' application for prejudgment interest on the challenged fees but denied their request for prejudgment interest on the past interest. Defendants appeal, raising fifty-three points[7] and Plaintiffs cross-appeal, raising two points.

## Legal Background

 Absent an exception, the maximum annual interest rate that a lender may charge in Missouri is ten percent or the "market rate," which is calculated according to long-term U.S. government bond yields. § 408.030. A loan that charges more than the maximum interest rate is usurious. "[U]sury is the taking or exacting of interest at a rate in excess of that allowed by law for the loan or use of money." *Redd v. Household Fin. Corp.*, 622 S.W.2d 255, 257 (Mo.App. E.D.1981).[8]

The MSMLA creates an exception to this normal rule. "Enacted in 1979, the [M]SMLA is a consumer-protection measure designed to regulate the business of making high interest second mortgage loans on residential real estate." *Avila v. Cmty. Bank of Va.*, 143 S.W.3d 1, 4 (Mo. App. W.D.2003) (internal quotation marks and citation omitted). Although Missouri law prohibits lenders from charging interest of more than ten percent or the market rate, under the MSMLA lenders can bypass this restriction for second mortgage loans, provided they otherwise comply with

---

4. The jury was presented with 34 loans, however, it was determined that the suit was inapplicable to three of these loans. Judgment was reduced to reflect the correct number of loans.

5. Homecomings was held liable only for past and future interest.

6. The jury was not asked to make a finding on punitive damages against Homecomings.

7. Homecomings joined in Residential's brief, and Household and Wachovia each filed separate briefs. Because Defendants each raise many of the same arguments, we have combined the overlapping points we address into "issues."

8. It is apparently not disputed that the interest rates charged in the instant case exceeded Missouri's usury rate absent the MSMLA. In 1999, Missouri's "market rate" was at all times below 9.1%.

its restrictions. *See Thomas v. U.S. Bank Nat'l Ass'n ND*, 575 F.3d 794, 796 n. 1 (8th Cir.2009). Prior to 1998, the MSMLA permitted lenders to charge up to 20.04% on these second mortgage loans, provided the loans otherwise complied with its restrictions. *Avila*, 143 S.W.3d at 4.

In 1998, the MSMLA was amended to remove the limit on interest rates, but the fee restrictions remained in place.[9] *Adkison v. First Plus Bank*, 143 S.W.3d 29, 30 (Mo.App. W.D.2004). The MSMLA permits lenders to charge "rates agreed to by the parties" on these second mortgage loans provided the loans otherwise comply with its restrictions. *Id.* at 32 (citing § 408.232). The Act thus allows lenders to charge interest rates on second mortgages that exceed Missouri's statutorily prescribed usury rate, but "[t]he limits on closing costs and fees ... act as a trade-off." *Thomas*, 575 F.3d at 796 n. 1. If a second mortgage loan does not comply with the restrictions of the MSMLA, it does not benefit from the MSMLA's provisions permitting it to charge a 20.04% interest rate (prior to 1998) or any "rates agreed to by the parties" (after 1998). *See id.*; § 408.232. The lender is subject to civil and criminal penalty for charging fees not authorized by the Act. *Avila*, 143 S.W.3d at 4.

Plaintiffs' claims of direct liability against Defendants were brought under the MSMLA. Plaintiffs also alleged that Assignee Defendants were derivatively liable for MCR's violations of the MSMLA through HOEPA and common law. In HOEPA, Congress created a means, under federal law, for a plaintiff to "seek relief from an assignee of a HOEPA loan for all claims (including state law claims) which the plaintiff could have brought against the original creditor." *Bryant v. Mortg. Capital Res. Corp.*, 197 F.Supp.2d 1357, 1366 (N.D.Ga.2002). It provides that assignees of HOEPA (high interest) loans "are derivatively liable" for the conduct of the assignor by eliminating any "holder in due course" defense for assignees of mortgage loans falling within its definitions. *Schwartz v. Bann–Cor Mortg.*, 197 S.W.3d 168, 179 (Mo.App. W.D.2006) (citing 15 U.S.C. § 1641(d)). In enacting this provision, "Congress intended to place the increased burden of inquiring into the legitimacy of the lending practices engaged in by the original lender upon the assignees of HOEPA loans." *Bryant*, 197 F.Supp.2d at 1365. This was intended to "encourage investors in the secondary market for HOEPA loans to more carefully scrutinize the backgrounds and qualifications of those with whom they choose to do business." *Id.* It also consequently "allocates to the assignee the cost associated with the misconduct of the original lender in such instances where the assignee fails to inquire into or otherwise discover the deceptive and unlawful practices engaged in by the original lender." *Id.*[10]

9. Senate Bill No. 792, § A, in subsec. 1, substituted "rates agreed to by the parties" for "a rate which shall not exceed one and sixty-seven hundredths percent per month." 1998 Mo. Laws 1449, 1457.

10. We note one commentator's opinion that this question—should investors be required to monitor lenders for predatory practices—has become the most controversial and important question in the debate over substantive mortgage lending regulatory reform.... With the flood of over forty state and local predatory lending laws, no issue has proven to have more consequence for the protection of consumers and for the liability of secondary mortgage market than the potential liability of assignees under these statutes.
Christopher L. Peterson, *Predatory Structured Finance*, 28 Cardozo L.Rev. 2185, 2190, 2243 (Apr.2007).

### Jurisdiction and Class Certification·

*Household and Wachovia: the Mitchells' Standing*

In their first points, Household and Wachovia each argue that the trial court erred in denying their motions to dismiss because, they contend, the Mitchells had no standing to sue either entity. Because standing is an issue of law, our review is *de novo. Mo. State Med. Ass'n v. State,* 256 S.W.3d 85, 87 (Mo. banc 2008).

In Missouri, subject matter jurisdiction derives directly from article V, section 14 of the Missouri Constitution, which states that "circuit courts shall have original jurisdiction over all cases and matters." *Hayes v. State,* 301 S.W.3d 542, 547 (Mo. App. W.D.2009). Standing is related to the rule that a court may not issue advisory opinions. *State ex rel. Williams v. Marsh,* 626 S.W.2d 223, 227 (Mo. banc 1982). It is " 'used to ascertain if a party is sufficiently affected by the conduct complained of in the suit, so as to insure that a justifiable ·controversy is before the court.' " *City of Wellston v. SBC Commc'ns, Inc.,* 203 S.W.3d 189, 193 (Mo. banc 2006) (quoting 15 Mo. PRAC. CIVIL RULES PRACTICE § 52.01–2 (Mary Coffoy ed., 2d ed.1997)). In its essence, standing requires "that the parties seeking relief must have some personal interest at stake in the dispute, even if that interest is attenuated, slight, or remote." *Adams v. Cossa,* 294 S.W.3d 101, 104 (Mo.App. E.D. 2009) (internal quotation marks and citation omitted); *see also Mo. State Med. Ass'n,* 256 S.W.3d at 87.

Whether the standing requirement is met is determined from the petition. *Adams,* 294 S.W.3d at 105. The requirement is satisfied by the plaintiffs' allegation of an actual or threatened injury. *Id.* at 104. Here, Plaintiffs alleged they were injured by violations of the MSMLA committed by, *inter alia,* MCR, Residential, Household, and Wachovia. They contended MCR violated the MSMLA by charging illegal loan fees, that Assignee Defendants were liable for MCR's violation, and that Defendants independently violated the MSMLA with respect to Plaintiffs' loans and conspired to violate it. Plaintiffs further alleged they were injured by Defendants' charging and receiving interest on the illegal fees, which were financed into the loans purchased by Defendants. Their allegations were also asserted against Defendants as a class, and the petition further sought joinder of Defendants under Rule 52.04(a).

Household and Wachovia, however, dispute that the Mitchells in particular suffered an injury in fact entitling them· to bring suit against Household and Wachovia. They argue that because the Mitchells dealt only with MCR and Residential, any alleged injury to the Mitchells is attributable to MCR and Residential, and the Mitchells did not have standing to assert the claims of other class members against Household and Wachovia as assignees of MCR's loans.

This case presents a unique procedural question: can a named plaintiff in Missouri assert her MSMLA claim not just against the holder of her loan, but also against other assignees of the loan originator on behalf of a class? As noted by commentators, courts have conflicted as to whether this multi-defendant posture raises a question of standing, which is a jurisdictional question in Article III courts and in states with similar constitutional requirements, or a question of typicality, which is an issue of federal and state procedural rules for class certification. *See, e.g., Master Fin., Inc. v. Crowder,* 409 Md. 51, 972 A.2d 864, 881 (2009) (discussing cases addressing this issue); *Weld v. Glaxo Wellcome, Inc.,* 434 Mass. 81, 746 N.E.2d 522, 529

(2001) (finding that defendants might argue either that standing or typicality were lacking as such "related concepts" and opting as a state court to analyze the issue under typicality requirements); *see also* William D. Henderson, Comment, *Reconciling the Juridical Links Doctrine with the Federal Rules of Civil Procedure and Article III*, 67 U. CHI. L.REV. 1347, 1349 (Fall 2000).

Courts have also widely conflicted as to the jurisdictional and procedural propriety of such an action. *See, e.g., Moore v. Comfed Sav. Bank*, 908 F.2d 834, 838–39 (11th Cir.1990) (finding permissive joinder of defendant loan holders proper on similar facts, though named plaintiffs had no direct dealings with them); *compare Master Fin., Inc. v. Crowder*, 972 A.2d at 881 (finding that named plaintiffs could not "fairly and adequately protect the interests of those class members" whose loans were held by other defendants but noting standing analysis would lead to same result); *see also Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir.2004); James Keenley, Comment, *How Many Injuries Does it Take? Article III Standing in the Class Action Context*, 95 CALIF. L.REV. 849, 851–52 (June 2007). Those courts that have found the class action proper have largely done so under two theories. The first theory identifies the class as the party in interest who is required to allege injury in fact. Such courts find, for example, that:

> In class actions the requirement that the named representative plaintiff have a personal stake in the form of a direct injury is less compelling on jurisdictional grounds. In such cases, the *class* itself is the real party in interest. If the unnamed members of the class satisfy the requirements of standing, then a real controversy exists between the class and the defendant, which should be sufficient to invoke the court's jurisdiction.

*Cedar Crest Funeral Home v. Lashley*, 889 S.W.2d 325, 329 (Tex.Ct.App.1993).

The second theory relies on the "juridical links doctrine," which is "a procedural device that permits collective adjudication of related claims." *Weld*, 746 N.E.2d at 530. The doctrine is found where there exists "a legal relationship among the defendants that permits a single resolution of the dispute [as] preferable to a multiplicity of similar actions." *Lashley*, 889 S.W.2d at 332. For example, in *Mull v. Alliance Mortgage Banking Corporation*, the district court discussed Sixth Circuit holdings that required a named plaintiff to have an injury against each defendant, but explained that this standing rule was subject to exceptions for conspiracy or concerted schemes and to "[i]nstances in which all defendants are *juridically related* in a manner that suggests a single resolution of the dispute would be expeditious.' " 219 F.Supp.2d 895, 908 (W.D.Tenn.2002) (quoting *Thompson v. Bd. of Educ. of Romeo Cmty. Sch.*, 709 F.2d 1200, 1205 (6th Cir. 1983)). The *Mull* Court ultimately rejected the plaintiffs' standing where the named plaintiffs failed to allege which, if any, of the defendant loan holders held their loans and no class had been certified. 219 F.Supp.2d at 909. By contrast, the *Weld* Court identified the "juridical links" doctrine to be analogous to state rules governing permissive joinder. 746 N.E.2d at 530. A federal district court in Massachusetts, however, described the doctrine as a rule of *substance* answering the "question of whether two defendants are sufficiently linked so that a plaintiff with a cause of action against only defendant one can also sue the other defendant under the guise of class certification." *In re Eaton Vance Corp. Securities Litigation*, 220 F.R.D. 162, 165 (D.Mass.2004). Yet a federal court in Delaware recently stated that "the juridical link doctrine is inapplicable to issues of standing, and is appropriately

considered in a class certification analysis." *Johnson v. Geico Cas. Co.*, 673 F.Supp.2d 244, 255 (D.Del.2009).

To the best of our knowledge, the juridical link doctrine has not heretofore been adopted nor addressed by Missouri state courts. We believe both its application and its role within federal and state courts to be uncertain. Like the Seventh Circuit, "[w]e are skeptical that the use of this terminology is conducive to sound analysis of the kind of problem presented here." *Payton v. Cnty. of Kane*, 308 F.3d 673, 679 (7th Cir.2002).

■ We find the reasoning of those courts that hold the class certification issue to be antecedent to the standing issue to be most persuasive. As noted by the *Payton* court, the United States Supreme Court has found issues of class certification to be properly analyzed prior to standing as they are " 'logically antecedent to Article III concerns, and themselves pertain to statutory standing, which may properly be treated before Article III standing.' " *Id.* at 680 (quoting *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999)); *see also* § 507.070 (class action statute). We also find most judicially rational those courts finding that "once a class is properly certified ... standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs." *Payton*, 308 F.3d at 680.

We further find convincing that such an approach comports with the underlying goals of Missouri class actions. Permitting the multi-defendant allegations here promotes judicial efficiency, due process, and is in accord with the purposes behind allowing class actions, which is to provide an "economical means for disposing of similar lawsuits while simultaneously protecting defendants from inconsistent obligations and the due process rights of absentee class members." *State ex rel. Coca–Cola Co. v. Nixon*, 249 S.W.3d 855, 860 (Mo. banc 2008) (internal quotation marks and citation omitted).

Key to our finding is that this suit relied on common, essential factual and legal determinations as to the loan originator MCR, its lending practices in Missouri, and the liability of its assignees. *Compare Mayo. v. GMAC Mortg., LLC*, No. 08–00568–CV–W–DGK, 2010 U.S. Dist. LEXIS 51517 (W.D.Mo. Mar. 1, 2010) (finding no standing for putative class representatives for alleged MSMLA violations with no central loan originator and no allegations of a common scheme). MCR's liability for violation of the MSMLA was on trial; HOEPA provided for its assignees to hold that liability. 15 U.S.C. § 1641(d). To exclude MCR's other Missouri borrowers, and MCR's other Missouri loan holders, would create the inefficiency of multiple trials of these threshold issues and, further, could effectively preclude both plaintiff and defendant parties from litigating issues key to a determination of their rights. *See, e.g., Spath v. Norris*, 281 S.W.3d 346, 351 (Mo.App. W.D.2009) (discussing collateral estoppel concerns); *Moore*, 908 F.2d at 839 (finding that through principles of *stare decisis*, failing to join defendant loan holders with whom named plaintiffs had no dealings to case against other loan holders could impair or impede other plaintiffs' ability to protect legal interests).

This is not a case of the named representatives seeking to "piggyback" on the injuries of the class. *See Payton*, 308 F.3d at 682. The named plaintiffs must be able to assert an injury in fact in the suit against the originator. More importantly, the named plaintiffs must also be able to meet the requirements of class certification, in particular "typicality." *See* discus-

sion *infra.* Once the class is certified, the question then becomes whether the class properly has standing to assert its claim against each of the defendants. In this context, this insures that Missouri's jurisdictional requirement that the courts preside only over "cases and matters" is met. *See* Mo. Const. art. 5, § 14. Consequently, contrary to Household and Wachovia's argument, the Mitchells' alleged injury is sufficient to insure a justiciable controversy. Therefore, Household and Wachovia's first points are denied.

*Household and Wachovia: the Mitchells' Class Representation*

■ In their second points, Household and Wachovia relatedly argue that the trial court erred in certifying the class because the Mitchells had no claims against Wachovia or Household. We review a trial court's decision to certify a class under an abuse of discretion standard. *Hale v. Wal–Mart Stores, Inc.*, 231 S.W.3d 215, 221 (Mo.App. W.D.2007). "A court abuses its discretion [in certifying a class action] only if its ruling is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration." *Dale v. Daimler-Chrysler Corp*, 204 S.W.3d 151, 164 (Mo. App. W.D.2006) (internal quotation marks and citation omitted). A court abuses its discretion if the class certification is based on an erroneous application of the law or the evidence provides no rational basis for certifying the class. *Id.* For purposes of reviewing class certification, we accept the named plaintiffs' allegations as true. *Plu-*

*bell v. Merck & Co., Inc.*, 289 S.W.3d 707, 710 n. 2 (Mo.App. W.D.2009).

Rule 52.08 provides four prerequisites to a class certification, "commonly referred to as numerosity, commonality, typicality, and adequacy." [11] *Id.* at 712. Household and Wachovia argue that because the Mitchells' MCR-originated loans were purchased by Residential, their claims were not typical of the class, which was defined as "[a]ll individuals who, on or after July 29, 1987, obtained a 'Second Mortgage Loan' as defined by § 408.231.1 from [MCR] on real property located in Missouri."

■ The typicality prerequisite is met despite factual variances if (1) the named representatives' "and the class members' claims arise from the same event or course of conduct by the defendant, (2) the conduct and facts give rise to same legal theory, and (3) the underlying facts are not markedly different." *Plubell,* 289 S.W.3d at 715 (internal quotation marks and citation omitted). Typicality is not defeated by speculative variations in the claims, and no showing of the likelihood of an individual's success on the merits is required. *Id.*

Household and Wachovia contend that the typicality requirement was not met because the allegedly unlawful behavior was not common to all the putative class members and that there were "numerous individual questions of fact and law." They rely on *Canady v. Allstate Insurance Company,* No. 96–0174–CV–W–2, 1997 WL 33384270, 1997 U.S. Dist. LEXIS 24067 (W.D. Mo. June 19, 1997),[12] which

11. Rule 52.08(a) provides:

Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common

to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

12. Because Rule 52.08 and Fed.R.Civ.P. 23 are identical, Missouri state courts may con-

found that representatives of a putative homeowner class failed to show typicality against defendant insurers because each claim in the case was separate and distinct: "no pattern or practice [was] sufficiently alleged." *Canady*, 1997 WL 33384270, at *6, 1997 U.S. Dist. LEXIS 24067, at *19. The *Canady* court specifically noted that the plaintiffs had failed to allege any concerted action or conspiracy and held that "[a]bsent such an allegation, no class may be maintained against the defendants." *Id.* at *6, 1997 U.S. Dist. LEXIS 24067 at *16. Here, however, Plaintiffs alleged that Defendants "individually and jointly participated in and acted in furtherance of" a "predatory and fraudulent lending scheme" by providing the financing to MCR to fund the scheme. They alleged that MCR violated the MSMLA, that Defendants violated the MSMLA through their financing and loan purchasing arrangements with MCR, and that the wrongs alleged against Defendants and remedies sought were "identical, the only difference being the exact monetary amount" for which each Defendant was liable. This was sufficient to make the Mitchells' claims typical of the class. Household's and Wachovia's second points are denied.

### Juror Nondisclosure

■ In its third point, Wachovia argues that the trial court erred in denying its motion for new trial because three jurors failed to disclose involvement in prior litigation during *voir dire*. During *voir dire*, Defense Counsel asked, "Let me go to the flip side. I've asked about people in the same position as the Mitchells. Let me ask you about people that are in the same position as the defendants are. Anybody here who has been a defendant in a lawsuit?" Wachovia argued that three jurors failed to disclose that they had been defendants in lawsuits. Juror Cameron had been subject to two collection actions—one involving an outstanding balance on a credit card, and the other involving an outstanding balance for dental services. Juror Ishmael[13] had been subject to three collection actions—two involving delinquent taxes, and another involving an outstanding balance on a credit card. Juror Moore had been a debtor in a bankruptcy case. Wachovia argues that the three jurors in question understood defense counsel's question, that the question triggered a duty to disclose, the jurors actually remembered or should have remembered the prior litigation, and that they intentionally failed to disclose the information.[14]

sider federal interpretations of Federal Rule 23 in interpreting Rule 52.08. *Union Planters Bank, N.A. v. Kendrick*, 142 S.W.3d 729, 735 n. 5 (Mo. banc 2004).

13. We note that Juror Ishmael was one of two jurors who did not return a verdict in favor of Plaintiffs.

14. *Voir dire* occurred on December 3 and December 4, 2007. The jury returned a verdict on January 4, 2008. Plaintiffs argue that the argument of jury misconduct was untimely and, therefore, waived, because Wachovia did not raise the issue before the jury rendered a verdict. They contend the jurors' case information was publicly available on

Missouri's automated case record service, CaseNet, and that Wachovia should not be permitted to raise the issue post-trial. In *McBurney v. Cameron*, we noted in dicta that the issue of timeliness was before the Missouri Supreme Court in 1994, and that it rejected the argument that a failure to research juror experience amounted to a waiver. 248 S.W.3d 36, 42 (Mo.App. W.D.2008) (discussing *Harlan ex rel. Brines v. Cibis*, 882 S.W.2d 138 (Mo. banc.1994)). However, with advancing technology since *Brines*, including CaseNet, the *McBurney* court cautioned that the result in *Brines* may have been different in 2008 had a party raised the waiver argument. *See id.* at 41. We also encouraged counsel to

 A juror's nondisclosure may be intentional or unintentional. *Wilford ex rel. Williams v. Barnes Hosp.*, 736 S.W.2d 33, 36 (Mo. banc 1987). If the disclosure is intentional, prejudice will be presumed, thereby requiring a new trial. *Id.* at 37. "Intentional nondisclosure occurs: 1) where there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and 2) where it develops that the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable." *Id.* at 36. Consequently, intentional nondisclosure can occur only if counsel's questions during *voir dire* were clear. *McBurney v. Cameron*, 248 S.W.3d 36, 42 (Mo.App. W.D.2008). "[I]f a person could reasonably be confused, the question is not sufficiently clear to warrant further inquiry into the alleged nondisclosure." *Id.*

 We review the clarity of a question posed during *voir dire* under a *de novo* standard. *McBurney*, 248 S.W.3d at 42. "It is only after it is objectively determined that the question was reasonably clear in context that we consider, under an abuse of discretion standard, whether the trial court abused its discretion in deciding whether a nondisclosure was intentional." *Id.* The burden of showing that a question was clear and unambiguous, thereby triggering a venire person's duty to disclose, is on the party seeking a new trial. *Id.*

While Defense Counsel's question in the current case, in context, might suggest a reasonable venire person *could* have understood that counsel meant the venire members to disclose all litigation, "it does not show that in the total context the question was so *clear* that every reasonable venire member *would* have believed

that counsel wanted to know about all kinds of litigation." *McBurney*, 248 S.W.3d at 45–46. The phrase "people who are in the same position as the defendants are" preceded by "[a]nybody here who has been a defendant in a lawsuit" is arguably ambiguous. *Compare Johnson v. McCullough*, 306 S.W.3d 551, 556 (Mo. banc 2010) (finding intentional nondisclosure where the question posed was "Now not including family law, has anyone ever been a plaintiff or a defendant in a lawsuit before?"). In the present case, a venire person could have interpreted the question broadly, as Wachovia argues, to be asking for disclosure of all previous litigation. Alternatively, a venire person could interpret the question more narrowly, as Plaintiffs argue, to include only lawsuits and lawsuits similar to the case at bar, i.e., "people who are in the same position as the defendants." As noted by Plaintiffs, "[t]he questions did not ask the panel members whether they had ever filed a bankruptcy ... Nor did the questions ask if the panel members had ever been a defendant in a collection action or had ever been garnished." Because the venirepersons could reasonably have interpreted the question differently than Wachovia now argues, we hold the question was not so clear as to "warrant further inquiry." *See McBurney*, 248 S.W.3d at 42. Wachovia's third point is therefore denied.

## Defendants' Liability

### 1: Missouri Law Applied to Plaintiffs' Loans

In the first substantive issue on appeal, Defendants argue that the fee restrictions of the MSMLA did not apply to Plaintiffs' loans and the trial court thus erred in directing a verdict that the loans violated the MSMLA. After its 1998 amendment

make challenges of juror misconduct before

the submission of the case. *Id.*

and prior to being revised in 2004, subsection 408.232.4 provided that "[s]ections 408.231 to 408.241 shall not apply to any loans on which the rate of interest charged is lawful without regard to the rates permitted in subsection 1 of this section."[15] It thus provided that the fee limitations were "only applicable to second mortgage loans on which an unlawful rate of interest is charged." *Avila*, 143 S.W.3d at 4. Relying on *Adkison*, Defendants argue California law applies to the interest rate analysis because MCR was a California-licensed real estate broker and the interest rate was lawful in California, thus rendering the MSMLA inapplicable. *See Adkison*, 143 S.W.3d at 34–36. Because Defendants raise an issue of law, our review is *de novo*. *Schwartz*, 197 S.W.3d at 170.

In *Adkison*, we held that the MSMLA was inapplicable to the plaintiffs' claims that a state-chartered bank charged illegal fees because federal law permits federally insured state-chartered banks to export interest rates authorized under their home state's laws. *See* 143 S.W.3d at 31; *see also* 12 U.S.C. § 1831d(a); *Thomas*, 575 F.3d at 799. The purpose of the federal provision is "to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates." 12 U.S.C. § 1831d(a); *see generally* Lynn M. Ewing, Jr. & Kendall R. Vickers, *Federal Pre-emption of State Usury Laws Affecting Real Estate Financing*, 47 Mo. L.Rev. 171, 171–76 (Spring 1982). Because the federally insured state-chartered bank in *Adkison* could export its interest rates, which were legal in California, the interest rate was "lawful" as defined in subsection 408.232.4 and the MSMLA fee restrictions did not apply. *Adkison*, 143 S.W.3d at 35–36. We concluded the MSMLA made "reasonable accommodation to interests of interstate regulation by the federal government." *Id.* at 35.

The reasoning of *Adkison* does not apply in this case. MCR was a California licensed real estate broker, not a "state-chartered insured depository institution." *See* 12 U.S.C. § 1831d(a). Defendants have failed to point us to any source indicating that federal law requires us to apply a foreign state's laws regarding interest rates to real estate brokers. Nor have they explained how concerns with interstate regulation of banking come into play in the regulation of fees that may be charged by real estate brokers. Consequently, we do not agree that California interest rate regulation should be applied to MCR's loans made to these Missouri consumers in contravention of our traditional choice of law rules. Therefore, Residential and Homecomings' first point, Household's fourth point, and Wachovia's fourth point are denied.

### 2: The Loan Fees Violated the MSMLA

■ Defendants next argue that the trial court erred in directing a verdict that the loans violated the MSMLA because Defendants did not admit the challenged fees were unlawful and Plaintiffs did not show that the fees were unlawful. Subsection 408.233.1, RSMo 1994, mandated as follows:

> No charge other than that permitted by section 408.232 [providing for interest charges] shall be directly or indirectly charged, contracted for or received in

---

15. In 2004, subsection 408.232.4 was amended to provide that "[s]ections 408.231 to 408.241 shall not apply to any loans on which the rate of interest and fees charged are lawful under Missouri law without regard to the rates permitted in subsection 1 of this section and the fees permitted in section 408.233."

connection with any second mortgage loan, except as provided in this section:

(1) Fees and charges prescribed by law actually and necessarily paid to public officials for perfecting, releasing, or satisfying a security interest related to the second mortgage loan;

(2) Taxes;

(3) *Bona fide closing costs paid to third parties, which shall include:*

(a) Fees or premiums for title examination, title insurance, or similar purposes including survey;

(b) Fees for preparation of a deed, settlement statement, or other documents;

(c) Fees for notarizing deeds and other documents;

(d) Appraisal fees; and

(e) Fees for credit reports;

(4) Charges for insurance as described in subsection 2 of this section;

(5) A nonrefundable origination fee not to exceed two percent[16] of the principal;

(6) Any amounts paid to the lender by any person, corporation or entity, other than the borrower, to reduce the rate on a second mortgage loan or to assist the borrower in qualifying for the loan.

(Emphasis added.) Plaintiffs alleged that the challenged fees were either: (1) not authorized by section 408.233.1 because they were not enumerated there; (2) not bona fide closing costs paid to third parties as authorized by section 408.233(3); or (3) not amounts paid by someone other than the borrower as authorized by section 408.233(6). After entering its partial di-

rected verdict, the trial court instructed the jury that MCR violated the MSMLA by "charging, contracting for, or receiving each of the following settlement charges or fees in connection with the [Residential] loans":

—Loan discount;

—Credit Report Fee paid to [MCR];

—Custodial fee;

—Underwriting fee;

—Processing fee;

—Federal Express Fee;

—Document preparation fee paid to [MCR];

—Attorney's fees;

—Flood certification fee;

—Wire transfer fee;

—Administration fee;

—No Prepay Fee; and

—Two–Point Reduction Fee

On appeal, Defendants contend that some of the contested fees could have been "bona fide fees closing costs paid to third parties," and thus lawful under subsection 408.233.1(3), because the enumerated list in 408.233.1(3) is not exclusive and therefore permits other fees paid to third parties. Defendants further argue that they should have been permitted to introduce evidence that certain fees, although listed on the HUD–1As as "to [MCR]", were actually paid to third parties and were thus lawful. Finally, Defendants contend a "discount fee" was not actually a discount fee; it was "prepaid interest to buy down the interest rate" and lawful under subsection 408.233.1.

The trial court generally may not direct a verdict in favor of the party

---

**16.** Senate Bill No. 792, § A, in subsection 1, subdivision (5) of section 408.233, substituted "five percent" for "two percent" and inserted "which may be used by the lender to reduce the rate on a second mortgage loan." 1998 Mo. Laws 1449, 1457. It also added a subdivision (7) permitting the assessment of "[f]or revolving loans, an annual fee not to exceed fifty dollars." *Id.*

who carries the burden of proof. *Brandt v. Pelican*, 856 S.W.2d 658, 664 (Mo. banc 1993). However, there are exceptions to the rule where the opponent admits the " 'truth of the basic facts upon which the claim of the proponent rests' " or the proof of the facts " 'is altogether of a documentary nature.' " *Id.* (quoting *Coleman v. Jackson Cnty.*, 349 Mo. 255, 160 S.W.2d 691, 693 (1942)). If the facts are shown by documents, the documents' correctness and authenticity are not questioned, impeached, or contradicted, and the documents establish facts beyond all doubt showing the proponent is entitled to relief as a matter of law, then the trial court may direct a verdict in favor of the proponent. *Id.* " 'This is upon the theory that there is no question of fact left in the case and that upon the questions of law involved the jury has no right to pass.' " *Id.* (quoting *Coleman*, 160 S.W.2d at 693); *see also Commerce Trust Co. v. Howard*, 429 S.W.2d 702, 708 (Mo.1968). When the grant of a directed verdict is based upon a conclusion of law, we review the trial court's decision *de novo. Ozark Emp't Specialists, Inc. v. Beeman*, 80 S.W.3d 882, 889 (Mo.App. W.D.2002).

██ In *Coleman*, the trial court directed a partial verdict in favor of the plaintiffs on their claims for underpayment of wages. 160 S.W.2d at 693. The plaintiffs introduced records of the defendants showing the amount plaintiffs had been paid to demonstrate the payment was less than statutorily required. *Id.* at 694. The *Coleman* court found that if the evidence "as a matter of law showed ... the assignors were entitled to pay in accordance with the statute schedule, then the plaintiff was properly granted peremptory instructions on the counts in question." *Id.* (emphasis added). "[A] writing may be said to be conclusive in respect to the truth of what it contains," if it is an instrument or a record

having legal effect, and the person to be bound by its truth was a party to it, vouched for its truth, or is otherwise estopped from denying its truth. *Johnson v. Mo. Ins. Co.*, 46 S.W.2d 959, 961 (Mo.App. 1932); *see also Bakelite Co. v. Miller*, 372 S.W.2d 867, 871 (Mo.1963) (discussing the foregoing as the "conclusive documentary evidence" rule).

We find these rules applicable to the present case. The HUD–1As used to show the fees charged in the loans were MCR's own documents, produced in compliance with federal law, and listed the fees as being paid to MCR. *See* 24 C.F.R. § 3500.8 (requiring HUD–1 or HUD–1A statements pursuant to 12 U.S.C. § 2603). The HUD–1As' validity is not questioned, and the settlement statements conclusively showed the fees had been "directly or indirectly charged, contracted for or received in connection" with the loans. *See* § 408.233. Section 408.233 provides that no fees shall be charged except those it permits. Consequently, unless the fees were excepted as provided for in section 408.233, they were unlawful. *Id.*

██ Defendants argue that subsection 408.233.1(3) excepts additional fees, other than those specifically enumerated, provided they are "[b]ona fide closing costs paid to third parties." They contend that because subsection 408.233.1(3) states bona fide closing costs "shall include," it does not limit those types of costs but, rather, illustrates through examples. They rely on our statement in *State ex rel. Nixon v. Estes* that "[w]hile the plain meaning of the word 'include' may vary according to its context in a statute, it is ordinarily used as a term of enlargement, rather than a term of limitation." 108 S.W.3d 795, 800 (Mo.App. W.D.2003). They contend "shall include" was legislative shorthand because "it would be impossible to anticipate, and too burdensome to list, all of the legitimate

charges that might be incurred." They thus argue that they should have been permitted to present evidence that fees listed on the HUD–1As, such as a "custodial fee" and a "wire transfer fee," could have been paid to third parties, and thus permissible under section 408.233, even though not enumerated therein as an exception.

We do not agree. Statutory interpretation is a question of law we review *de novo.* *R.L. Polk & Co. v. Mo. Dep't of Revenue,* 309 S.W.3d 881, 884 (Mo.App. W.D.2010). Our role in interpreting a statute is to determine the legislature's intent from the language it used and to give effect to that intent. *Estes,* 108 S.W.3d at 798. Defendants' interpretation of 408.233(3) defeats the statute's purpose. The MSMLA is a "comprehensive scheme." *U.S. Life Title Ins. Co. v. Brents,* 676 S.W.2d 839, 841 (Mo.App. W.D.1984). It offers a trade-off for lenders of second mortgage loans. *Thomas,* 575 F.3d at 796 n. 1. It allows lenders to charge interest rates that would otherwise constitute usury, while prescribing the fees that a lender may legitimately charge. *Id.* at 796 n. 1. Lenders have the choice to avoid the fee proscriptions; section 408.232.4 provides that if the loan rate itself is not usurious, *i.e.* otherwise lawful, then the limitations of the MSMLA do not apply.

The obvious intent is to allow high-interest rate second mortgage loans in order to open the flow of credit to higher-risk consumers, but to prohibit lenders of these loans from tacking on additional charges that prevent consumers from accurately comparing the real costs of competing loans. Defendants' argument thwarts that trade-off. The MSMLA does not permit a lender to charge a consumer unlimited interest *and* fees for any service the lender purports to pay a third party. The fees that section 408.233 excepts are those traditionally considered to be outside the context of usury. Some closing costs paid to third parties are excepted because an otherwise legal loan "does not become usurious by the fact that the transaction requires the borrower to pay an additional sum of money to a third person, provided that the lender in no way profits from such payment." *See* 15 Corbin on Contracts § 87.5 (2003). Similarly, section 408.233 excepts "amounts paid to the lender by any person, corporation or entity, other than the borrower, to reduce the rate on a second mortgage loan." Traditionally, sums not paid by the borrower do not make the transaction usurious. *See id.* Likewise, an insurance fee has been made permissible: fees do not generally make a loan usurious where they are for a service other than the loan itself, such as insurance premiums. *See id.* at § 87.6. We read the Missouri Legislature's list here as deliberate and exclusive. Further, where the legislature has intended to exclude *all* third-party fees, it has stated so clearly: section 408.052.1 excludes "bona fide expenses paid by the lender to any other person or entity ... for services actually performed in connection with a [residential real estate] loan" *without* enumerating a list of which fees are permissible.[17]

---

17. Household argues in its reply brief that a recent case from the Western District of Missouri "flatly disproves Plaintiffs' theory that the legislature never allowed any fee not specified in particular terms." *See Washington v. Countrywide Home Loans, Inc.,* No. 08–00459–CV–W–FJG, 2010 WL 199881, 2010 U.S. Dist. LEXIS 2623 (W.D.Mo. Jan. 13, 2010). Household's statement artfully edges on a misrepresentation of that court's ruling. In that case the court found a document processing fee paid to a third-party for preparation of a settlement statement and other closing documents fell within section 408.233.1(3)(b)'s allowance for third-party "[f]ees for preparation of a deed, settlement

Further, we read statutory language in its context. *See R.L. Polk & Co.*, 309 S.W.3d at 885. The cases on which Defendants rely to argue that "shall include" is a term of enlargement deal with contextual language quite different from subsection 408.233.1(3). For example, in *Estes* we noted that although "include" is ordinarily a term of enlargement, its plain meaning varies according to its context. *Estes*, 108 S.W.3d at 800. We interpreted "include" as used in the Missouri Merchandizing Practices Act (MMPA) to evidence the legislature's intent that it be a term of enlargement because of the statute's wide scope and the broad definitions provided in the preceding sentence. *Id.* at 800. Consequently, we find *Estes* distinguishable.

Given the purposes of the MSMLA, we believe the appropriate canon to apply here is embodied in the maxim *expressio unis est exclusio alterius:* the express mention of one thing implies the exclusion of another. *See, e.g., Tracy v. Klausmeyer*, 305 S.W.2d 84, 88 (Mo.App. 1957). More specifically, "[w]hen statutory exceptions are plainly expressed, courts cannot add to the exceptions or exclusions beyond those explicitly provided." *Smith v. Mo. Local Gov't Emps. Ret. Sys.*, 235 S.W.3d 578, 582 (Mo.App. W.D.2007). Because the legislature expressly listed those five bona fide closing costs it wished to except from section 408.233's prohibition, the phrase "shall include" is limited to those costs.[18]

Defendants next contend that the trial court erred in directing a verdict because they should have been permitted to present evidence that some of the fees paid by Plaintiffs, although listed on the HUD–1As as "to [MCR]," were actually paid to third parties and permitted under the specific enumerations of 408.233.1(3). For example, on the Mitchells' loan a "Document preparation to [MCR]" fee would have been permissible under 408.233.1(3)(b) had it been a bona fide fee paid to a third party, instead of to MCR. Defendants contend they were entitled to present evidence that despite the HUD1–As listing MCR as the recipient, the fees were actually advanced or reimbursed to third parties.

We do not agree as a matter of law. MCR charged these fees and plaintiffs financed them into the loans, the notes of which were payable to MCR. This fact is not disputed. A "payment" is a "delivery of money or its equivalent in either specific property or services by one person from whom it is due to another person to whom it is due." BLACK'S LAW DICTIONARY 1129 (6th ed.1990). MCR consequently was the recipient of the fees. We do not interpret the legislature's language to be superfluous. *Hyde Park Hous. P'ship v. Dir. of Revenue*, 850 S.W.2d 82, 84 (Mo. banc 1993). We presume the legislature "intended that every word, clause, sentence, and provision of a statute have effect." *Id.* Were lenders allowed to "advance," "reimburse," or "pass through" fees in order to

---

statement, or other documents." The court explicitly stated that because the fee fell within 408.233.1(3)(b) it was "unnecessary at [that] time to decide whether the enumerated list in Section 408.233.1(3)[was] exclusive." *Washington*, 2010 WL 199881, at *4, 2010 U.S. Dist. LEXIS, at *11.

18. In *Estes*, at issue was "include" as used in the definition of "trade" or "commerce" in the MMPA:

'Trade' or 'commerce', the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated. The terms 'trade' and 'commerce' include any trade or commerce directly or indirectly affecting the people of this state. 108 S.W.3d at 800 (quoting § 407.010(7)).

transform those fees listed as paid to the lender into fees the borrower "paid to third parties," we see no limit on the characterizations of payment that could conceivably be drawn within the MSMLA's statutory exception. MCR's argument would render the statute's "paid to third parties" language meaningless, contrary to the fact that the Missouri Legislature specifically excepted and enumerated five permissible fees, provided they were paid *by the borrower* to third parties.

Third, federal law specifically provides that the HUD–1As "must separately itemize each third party charge." 24 C.F.R. § 3500.8(b)(1). On the HUD–1As, MCR itemized some charges as third party charges—Plaintiffs did not challenge those charges, provided they were enumerated under subsection 208.433.1(3)—and MCR itemized some charges as "to [MCR]." In essence, Defendants argue that although MCR listed certain fees as paid to itself while complying with federal law, it should now be permitted to re-characterize those same fees as fees MCR merely collected for third parties, in order to now argue MCR complied with state law. However, the HUD–1As were documents *evidenced as a matter of law* and showed *as a matter of law* that these fees were not third party charges. *See Coleman,* 160 S.W.2d at 694. Defendants cannot have it both ways. Consequently, we find Defendants' HUD–1As showed that the contested fees were paid to MCR.

Finally, Defendants argue that they should have been entitled to argue that the "loan discount" fee paid by Plaintiffs to MCR was not really a "loan discount" fee but instead represented an "origination fee" permissible under 408.233(6). We reject this argument for the same reasons discussed above: the HUD–1As conclusively listed these fees as "loan discount" fees. A separate itemization was made for "origination fees." MCR charged the Mitchells, for example, a loan origination fee of 1.5% and a separate loan discount fee of 3.5%. The trial court was not required to allow Defendants to attempt to re-characterize the fees to the jury.

Because the HUD–1As showed the fees MCR charged and the trial court correctly determined, as a matter of law, that the challenged fees were unlawful under the MSMLA, the court did not err in directing a verdict for Plaintiffs on these issues. Residential and Homecomings' second point, Household's third point, and Wachovia's fifth point are denied.

### 3: Defendants Were Not Entitled to Present a Voluntary Payment Defense.

■ Defendants next argue that the trial court erred by not permitting them to set forth a voluntary payment defense. Plaintiffs moved *in limine* to preclude Defendants from presenting the defense, which the trial court granted. The "voluntary payment doctrine is well established ... and ... provides that a person who voluntarily pays money with full knowledge of all the facts in the case, and in the absence of fraud and duress, cannot recover it back, though the payment is made without a sufficient consideration, and under protest." *Huch v. Charter Commc'ns, Inc.,* 290 S.W.3d 721, 726 (Mo. banc 2009) (internal quotation marks and citation omitted).

In *Huch,* the Missouri Supreme Court found that the trial court erred in applying the voluntary payment defense to plaintiffs' claim under the MMPA where the defendant cable company sent its customers channel guides unsolicited and then charged them for the guides. *Id.* at 727. In the case of statutes carrying heightened public policy considerations, the court stated, certain defenses are not available to

defeat claims authorized by the act. *Id.* at 725. Because the purpose of the MMPA was to protect consumers, allowing Defendant to set forth a voluntary payment defense would nullify the legislature's intent and was therefore not valid. *Id.* at 727. Consequently, the voluntary payment doctrine is not available as a defense to a claim under the MMPA. *Id.*

Likewise, allowing Defendants to present a voluntary payment defense would negate the MSMLA's provision for consumer protections. Borrowers could be charged illegal fees, and so long as Defendants listed those fees on closing documents, they would escape liability. This requires the borrower to investigate and inspect each fee before paying it, thereby shifting the burden of complying with the statute to the borrower. Such a reading is wholly inconsistent with the purposes of a consumer protection statute. As the Missouri Supreme Court stated in *Eisel v. Midwest BankCentre,* to allow a lender to present a voluntary payment defense to the customer's payment for an unlawful transaction would mean "that a customer, not a mortgage lender, would be burdened with the responsibility to recognize the [illegality] and be barred from recovery due to having made a voluntary payment." 230 S.W.3d 335, 339–40 (Mo. banc 2007). Such a result would be "illogical and inequitable." *Id.* at 340; *see also Carpenter v. Countrywide Home Loans, Inc.,* 250 S.W.3d 697, 703 (Mo. banc 2008). Residential and Homecomings' third point, Household's fifth point, and Wachovia's sixth point are denied.

### 4: The Jury Could Properly Find that Assignee Defendants Violated the MSMLA

■ In the fourth substantive issue, Assignee Defendants argue that the trial court erred in denying their motions for directed verdict or JNOV on Plaintiffs' claim that they violated the MSMLA by "directly or indirectly charg[ing], contract[ing] for, or receiv[ing] one or more" of the unlawful settlement charges or fees. In accord with section 408.233.1, the jury was instructed to find liability if it believed Residential, Household, and Wachovia themselves "indirectly charged, contracted for, or received one or more" of the unlawful settlement charges or fees and Plaintiffs' class was thereby damaged.

Section 408.233.1 mandates:

> No charge other than that permitted by section 408.232 [19] shall be directly or indirectly charged, contracted for or received in connection with any second mortgage loan, except [the permitted fees]:

We review the evidence "in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Hess v. Chase Manhattan Bank, USA, N.A.,* 220 S.W.3d 758, 765 (Mo. banc 2007) (internal quotation marks and citation omitted). We do not reverse the jury's findings absent "a complete lack of probative fact to support its conclusion." *Shobe v. Kelly,* 279 S.W.3d 203, 209 (Mo. App. W.D.2009)

Assignee Defendants argue that the jury could not find that they indirectly charged, contracted for, or received the loan fees because, at most, Plaintiffs merely showed that they provided funds through their prior loan acquisitions from MCR and that the Missouri Legislature did not intend to "reach this type of activity." They further contend Plaintiffs' interpretation erroneously imposes "strict liability on any third

---

**19.** Section 408.232 sets the allowable interest rates for complying loans.

party that provided funds the lender ultimately used in making a loan that violated the SMLA." We disagree.

We presume "that the legislature included every word of a statute for a purpose, and that every word has meaning." *Robinson v. Advance Loans II, L.L.C.,* 290 S.W.3d 751, 755 (Mo.App. E.D.2009). Defendants' arguments amount to a requirement that a defendant must have *directly* charged, contracted for, or received fees or interest in connection with the unlawful charges. The language of section 408.233 is self-evident. Had the legislature intended to ascribe liability only if Defendants *directly* "charged, contracted for, or received," fees and unauthorized interest, it would not have ascribed liability where a defendant "directly *or indirectly*" engages in such conduct. We do not read the legislature's choice of language in a statute as surplusage. *Id.*

The legislature's intent to reach those loans that would otherwise escape liability through the secondary mortgage market is further evidenced by its broad choice of language: "charged, contracted for, *or* received." § 408.233.1 (emphasis added). Through the disjunctive, this language reaches even those entities that never received the fees or interest, never charged for them, or never contracted for them. Further, the legislature prohibited those charges merely made "in connection with" second mortgage loans. *See id.* This broad language additionally evidences the legislature's intent to cast a wide net over the market.

▆ Nor do we agree that the most Plaintiffs showed was that Assignee Defendants provided funds through prior loan acquisitions. As Wachovia itself notes, "'indirectly' charging or receiving a fee most naturally means using a conduit or intermediary to charge or receive a fee on one's behalf." And, as noted in the con-

text of usury: " 'The law will not tolerate any camouflage disguising a ... transaction to make it seem innocent.' " *Lucas v. Beco Homes, Inc.,* 494 S.W.2d 417, 422 (Mo.App.1973) (quoting *Webster v. Sterling Finance Co.,* 355 Mo. 193, 195 S.W.2d 509, 514–15 (1946)). "The law looks at the nature and substance of the transaction, and not to the color or form which the parties in their ingenuity have given it." *Id.* (quoting *Webster,* 195 S.W.2d at 514–15).

Plaintiffs argued that Assignee Defendants acted through MCR as their "correspondent" and introduced evidence that Assignee Defendants had significant control over the shape of the loans and the loan process. Plaintiffs presented Residential's "Master Commitment," in which Residential agreed to purchase loans from MCR complying with its "Client Guide"—a 500–plus page document setting forth loan terms. The Guide was incorporated into the sales contract between MCR and Residential and their agreement provided that: "All loans sold to Residential" would be governed by the agreement and the "Seller Guide." Household and MCR similarly entered into a "Bulk Continuing Loan Purchasing Agreement" in which Household set forth terms on which it would purchase MCR's loan portfolios, including the formula for the purchase price it would pay. Household's "Underwriting Guidelines" detailed criteria for the loans it would purchase in order to fulfill its goal of "providing a consistent secondary market for [the originator's] mortgage products." Its guidelines went so far as to include "Good-Bye Letters" for the loan originator to send to the borrowers when the loans were transferred. Plaintiffs also introduced Wachovia's "Sale & Purchase Agreement" with MCR that set forth its terms of purchase, as well as its "Home Improvement Correspondent Lending Correspon-

dent/Lending Broadcast." This manual for correspondents set forth detailed lending criteria, including worksheets for the correspondents and a phone audit script for correspondents to complete with the borrowers.

Plaintiffs argued that this control and the charging of the fees were essential to Assignee Defendants' business model. They contended that in order to securitize the loans, Assignee Defendants needed a large number of uniform loans; the originator needed a means to make a profit on its origination of the loans. By charging fees to the borrowers, the originator generated a profit and the Assignee Defendants were able to purchase the loans at a lower cost.

Although Defendants argue they were innocent of wrongdoing because they were not in privity with the borrowers until after the loans were acquired from MCR, the legislature clearly provided liability for "indirect" action in violating the MSMLA. Further, although Assignee Defendants argue they could not have "indirectly" acted through their role in MCR's loan originations, the jury was not required to believe them. Finally, the fees were rolled into the loan principal on which Defendants charged interest; this also supports a finding that Assignee Defendants "indirectly charged, contracted for or received" an unauthorized charge "in connection with" these second mortgage loans. We will not disturb the jury's verdict. Residential's fifth point, Household's seventh point, and Wachovia's eighth point are denied.

### 5: Defendants Were Barred from Recovering Interest on the Loans

In the fifth substantive issue on appeal, Defendants argue that the trial court erred in denying their motions for directed verdict or JNOV on Plaintiffs' claim that they violated section 408.236 of the MSMLA by charging or collecting interest on the loans. The jury was instructed to find liability if it believed Defendants "directly or indirectly charged, contracted for, or received interest in connection with" the loans and Plaintiffs' class was thereby damaged.

Section 408.236 provides that "[a]ny person violating the provisions of sections 408.231 to 408.241 shall be barred from recovery of any interest on the contract." [20] Defendants argue that the section only bars "recovery" of interest through legal process, thus prohibiting a violator from suing for the interest, rather than barring the lender from collecting the interest. They contend that Webster's Third New International Dictionary includes a definition of "recover," which is "to gain by legal process." They also point to Missouri statutes that authorize plaintiffs to "recover" certain monies in suits and provide for timelines within which such suits must be brought. *See* § 408.030.2; § 408.150.

Statutory interpretation is a question of law we review *de novo. R.L. Polk & Co.,* 309 S.W.3d at 884. Our primary rule in construing statutes is to determine the legislature's intent through the language used. *Schwartz,* 197 S.W.3d at 172. We look to the plain and ordinary meaning of words and phrases and look beyond such

---

**20.** In its entirety, section 408.326 provides:

Any person violating the provisions of sections 408.231 to 408.241 shall be barred from recovery of any interest on the contract, except where such violations occurred either:

(1) As a result of an accidental and bona fide error of computation; or
(2) As a result of any acts done or omitted in reliance on a written interpretation of the provisions of sections 408.231 to 408.241 by the division of finance.

meaning only when the resulting interpretation is absurd. *Adkison,* 143 S.W.3d at 33.

Black's Law Dictionary offers both definitions of "recover" argued by the parties:

1. To get back or regain in full or in equivalence <the landlord recovered higher operating costs by raising rent>.

2. To obtain by a judgment or other legal process <the plaintiff recovered punitive damages in the lawsuit>.

BLACK'S LAW DICTIONARY 1389 (9th ed.2009). "Recovery" is defined as:

1. The regaining or restoration of something lost or taken away.

2. The obtaining of a right to something (esp.damages) by a judgment or decree.

*Id.* Webster's similarly provides multiple definitions of "recover":

1. to get or win back . . .

2. to get well from . . .

3. to bring oneself back to normal balance or self-possession . . .

4. a: to make good the loss, injury, or cost of: make up for . . . b: to gain by legal process. . . .

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1898 (1993). Webster's defines "recovery" as:

1. means of restoration: cure, remedy

2. a: the obtaining in a suit at law of a right to something by a verdict, decree, or judgment of court.

*Id.*

We believe "recover" and "recovery" have two meanings as relevant to the arguments here. The first, the plain definition, is to get or obtain something under a claim of right, to collect. The second, narrower, definition is to obtain through legal judgment.

◼ The MSMLA is a remedial statute. *See Schwartz,* 197 S.W.3d at 178. Remedial statutes are liberally construed " 'so as' to meet the cases which are clearly within the spirit or reason of the law.' " *State ex rel. LeFevre v. Stubbs,* 642 S.W.2d 103, 106 (Mo. banc 1982) (quoting *State ex rel. Brown v. Bd. of Educ.,* 294 Mo. 106, 242 S.W. 85, 87 (1922)). Because the MSMLA is a remedial statute providing for criminal penalties, civil penalties, and "forfeiture," we find the broader definition of "recovery" to be applicable. As a result, we do not agree with Defendants that the section merely bars those who violate the MSMLA from suing for unpaid interest. Residential and Homecomings' sixth point and Wachovia's ninth point are therefore denied.

### 6: Assignee Defendants Were Not Derivatively Liable under Common Law

◼ In the sixth substantive issue we address on appeal, Assignee Defendants argue the trial court erred in directing a verdict holding them liable under Missouri "common-law assignee liability" principles.[21] The trial court directed the jury that Assignee Defendants were liable to the class "for damages in this case based on [MCR's] violations of the [MSMLA]. Therefore . . . you must award plaintiffs' class compensatory damages." Although the record is somewhat ambiguous, it appears that in addition to HOEPA assignee liability, the partial directed verdict was also based on a "common law" assignee liability.[22] Because our review is of an

---

**21.** The parties do not dispute that HOEPA would hold them derivatively liable for MCR's violations of the MSMLA as MCR's assignees. *See Schwartz,* 197 S.W.3d at 179.

**22.** It is somewhat unclear from our review of the cited portions of the record whether the trial court accepted Plaintiffs' theory of common law assignee liability. Post-trial, the

issue of law, the standard of review is *de novo. Schwartz*, 197 S.W.3d at 170.

Assignee Defendants first contend that the mortgage loans are negotiable instruments[23] governed by Missouri's Commercial Code and that they could not be liable as assignees for the assignor's wrongdoing because the Code itself does not create such liability. While we agree that the promissory notes fall under Missouri's enactment of UCC Article 3,[24] we disagree with Assignee Defendants' resulting argument. The UCC does not act to the exclusion of the common law absent an express provision within the UCC. The Code itself provides that "[u]nless displaced by the particular provisions of this chapter, the principles of law and equity . . . shall supplement its provisions." § 400.1–103; *see also Merz v. First Nat'l Bank of Franklin Cnty.*, 682 S.W.2d 500, 501–02 (Mo.App. E.D.1984). Thus, if there were a "common law" assignee-liability not displaced by the UCC, it would supplement the Code.[25]

However, we do not agree with Plaintiffs that there is a "common-law assignee liability" that would hold Assignee Defendants liable for MCR's acts in originating the loans, absent some affirmative act of their own. Plaintiffs rely on *Boulds v.*

*Chase Auto Finance Corp.*, 266 S.W.3d 847, 850 (Mo.App. E.D.2008), and *Lucas*, 494 S.W.2d at 424, to argue that a principle of "common law assignee liability" held Assignee Defendants liable for MCR's violation of the MSMLA. Neither case establishes such a proposition. In *Boulds*, the assignee of an automobile assignment contract was subject to the claims and defenses the buyer could assert against the original seller because of the Federal Trade Commission (FTC) holder rule,[26] which is not applicable to the present case. 266 S.W.3d at 852. In *Lucas*, assignee liability was not asserted; the noteholder was a finance company directly involved in the making of the loan. 494 S.W.2d at 420–21. Plaintiffs also rely on *Schwartz. See* 197 S.W.3d at 179. *Schwartz*, however, found that the assignee loan holders were derivatively liable as a result of HOEPA. *Id.*

In fact, there is a dearth of authority advancing that "common law assignee liability" is a principle in Missouri or the idea that affirmative liability may be established merely through receiving assignment of loans violating consumer protection laws. Analogous authority points to the contrary. In *Anderson v. Curls* for

---

parties argued whether the directed verdict was also based on state law assignee liability. In a footnote to its judgment and order, the trial court corrected a relevant portion of the transcript. By virtue of their arguments, we find the parties concede on appeal that the trial court accepted the state-law assignee liability theory in addition to HOEPA assignee liability.

**23.** Negotiable instruments are defined in section 400.3–104.

**24.** *See Merz v. First Nat'l Bank of Franklin Cnty.*, 682 S.W.2d 500, 501–02 (Mo.App. E.D. 1984): "A promissory note is a written contract for the payment of money. When dealing with a promissory note, a court must first turn its attention to Article 3 of the Uniform

Commercial Code." (internal citation omitted).

**25.** We also note that the section of the Code dealing with the Holder in Due Course doctrine provides that "it is subject to any law limiting status as a holder in due course in particular classes of transactions." § 400.3–302(g)

**26.** The FTC holder rule preserves consumers' defenses against subsequent holders by requiring a contractual notice provision in relevant contracts that provides in part, "[a]ny **holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof.**" *See* 16 C.F.R. § 433.2.

example, decided prior to Missouri's adoption of the UCC, it was held that the sale of a usurious loan did not, by itself, vest a usurious loan in the purchaser; rather, bad faith on the part of the purchaser was required in order to render the loan subject to the defense of usury. 309 S.W.2d 692, 696 (Mo.App.1958).

Although an assignee is said to "step into the shoes" of the assignor, this has generally been in accord with a principle of *nemo dat quod non habet*—one cannot transfer what one does not have—and thus it is said at common law that an assignee can acquire no greater right than the assignor held against the obligor. *See, e.g., Adams,* 294 S.W.3d at 105. It does not necessarily follow, however, that an assignment of a debt means that the assignee is subject to all of an obligor's causes of action against the assignor.

 As noted by a district court in Pennsylvania: "affirmative claims of fraud and violations of consumer protection laws . . . are inappropriate to assert against an assignee where there are no allegations that the assignee had any contact with the mortgagor or made any representations to the mortgagor and the factual basis for the claims occurred prior to assignment of the mortgage loan." *Stoudt v. Alta Fin. Mortg.,* No. 08–CV–2643, 2009 WL 661924, at *2 (E.D.Pa. Mar.10, 2009). There are policy principles that support the concept of assignee liability in the secondary mortgage market in order to defeat the practice of laundering illegal loans. As noted by a Texas court:

> Assignees of home solicitation contracts must be held responsible for the acts of their assignors; otherwise, we are faced with the prospect of unscrupulous salesmen pressuring consumers into contracts, assigning the benefit of the contract for cash, and disappearing. The assignee would be able to collect without risk, when the assignor could not do so.

*de la Fuente v. Home Sav. Ass'n,* 669 S.W.2d 137, 146 (Tex.Ct.App.1984), *overruled on other grounds by Home Sav. Ass'n v. Guerra,* 733 S.W.2d 134, 136 (Tex. 1987). However, both Congress and the Missouri Legislature have addressed these concerns through HOEPA and the MSMLA. In HOEPA, Congress sought:

> to ensure that the High Cost Mortgage market polices itself. Unscrupulous lenders were limited in the past by their own capital resources. Today, however, with loans sold on a regular basis, one unscrupulous player can create havoc in a community by selling loans as fast as they are originated. Providing assignee liability will halt the flow of capital to such lenders.

S.Rep. No. 103–169, at 28 (1994) *reprinted in* 1994 U.S.C.C.A.N. 1881, 1912. It thus provided for assignee liability through HOEPA's negation of the holder in due course (HDC) defense. Likewise, the Missouri Legislature crafted a wide net, creating liability under the MSMLA for "directly or indirectly charg[ing], contract[ing] for or receiv[ing]" unlawful charges "in connection with any second mortgage loan." § 408.233.1. While a lender may be held liable for directly or "indirectly" charging, contracting for, or receiving unlawful charges, "indirect" still implies the lender's liability for its own actions, not those of the loan originator.

Consequently, we believe the trial court erred to the extent it directed a partial verdict against Assignee Defendants based on a "common law assignee liability," holding them derivatively liable for MCR's conduct. Defendants' liability relied on either assignee liability for MCR's conduct through HOEPA or through their own vio-

lations of the MSMLA.[27] Therefore, Residential's fourth point, Household's fifth point, and Wachovia's seventh point are granted.[28]

### Compensatory Damages

#### 7: Plaintiffs Were Entitled to Recover Interest Paid

In the seventh issue, Defendants argue the trial court erred in denying their post-trial motions because, they contend, the MSMLA does not authorize interest to be recovered as compensatory damages. The trial court found as a matter of law that section 408.236 "allows for the recovery of interest paid for violating the statute." Defendants, however, argue that the damages measure must be found within section 408.562.

Section 408.562 authorizes a private right of action for violation of the MSMLA and provides in relevant part:

> In addition to any other civil remedies or penalties provided for by law, any person who suffers any loss of money or property as a result of any act, method or practice in violation of the provisions of sections 408.100 to 408.561 may bring an action ... to recover actual damages. The court may, in its discretion ... provide such equitable relief as it deems necessary and proper.

Defendants contend that Plaintiffs did not pay interest "as a result of any act method or practice in violation" of the MSMLA and that, consequently, there was no causal connection allowing them to recover interest as damages under section 408.562.

The interest rate charged on the loans was made permissible by the MSMLA. Defendants were allowed to charge and collect interest exceeding Missouri's usury rate-so long as they complied with the MSMLA's fee restrictions. See § 408.030; *Thomas,* 575 F.3d at 796 n. 1. However, Defendants did *not* comply with the MSMLA's fee restrictions; therefore, they were no longer excepted from compliance with Missouri's usury rate and the loans' interest rates became unlawful. § 408.030. In absence of the MSMLA, usurious interest rates under sections 408.050 and 408.030 would authorize Plaintiffs' damages at twice the amount of the excess interest. See *Affiliated Acceptance Corp. v. Boggs,* 917 S.W.2d 652, 659 (Mo.App. W.D.1996).

The MSMLA however, provides a specific remedy for a lender's violation of Missouri law governing second mortgages, in addition to the remedies provided by section 408.562 for violating Missouri lending law. Section 408.236 provides that by violating the MSMLA's fee limitations, Defendants were barred "from recovery of any interest on the contract." Section 408.562 provides that as a default where Chapter 408 is violated, a person may seek actual damages "[i]n *addition to* any other civil remedies or penalties provided for by law." (emphasis added). Consequently, we reject Defendants' argument that section 408.562 limited Plaintiffs' damages.

---

**27.** Assignee Defendants further argue that they were entitled to use the "holder in due course" (HDC) defense to deflect derivatively liability for Plaintiffs' claims, except those claims springing from HOEPA. Because we have already determined that liability here required assignee liability through HOEPA or Defendants' own liability for violating the MSMLA, and HOEPA eliminates the HDC defense for loans subject to its provisions, Defendants' HDC issue is rendered moot. Consequently, Residential's seventh point, Household's eighth point, and Wachovia's tenth point are denied.

**28.** Because HOEPA provides for assignee liability and was an alternative basis for the partial directed verdict, our finding does not reverse the partial directed verdict.

Moreover, Defendants' argument would limit Plaintiffs' recovery to the unlawful fees and the interest paid on those fees. This would allow a lender to retain its profit from charging a usurious interest rate, despite failing to comply with the MSMLA. We do not believe the legislature intended such a result. Consequently, the trial court did not err in finding Plaintiffs were entitled to the interest on their illegal loans as compensatory damages. Residential and Homecomings' ninth point, Household's ninth point, and Wachovia's twelfth point are denied.

### P–1: Plaintiffs' Cross–Appeal; Past Interest Award Against Homecomings

 In the first point of their cross-appeal, Plaintiffs argue the trial court erred in denying their motion for JNOV and alternative motion for additur in lieu of a new trial against Homecomings because, they contend, the jury's award of past interest against Homecomings should have been $3,414,962 rather than $682,992.

Plaintiffs' expert testified that total past interest on the loans was approximately $4 million. In their summary of damages, Plaintiffs attributed $3,414,962 in past interest to Residential, $319,219 in past interest to Household, and $309,550 in past interest to Wachovia. In pertinent part in Instruction 13, the jury was instructed that if it found against Residential:

> You must award plaintiffs' class such sum as you believe will fairly and justly compensate plaintiffs' class for any of the ... damages that you believe plaintiffs' class sustained as a result of the conduct of [MCR] as instructed in [the partial directed verdict], or if you find in favor of plaintiffs' class under [the direct liability instruction]:
>
> ....

> The total amount of any interest paid by plaintiffs' class in connection with the [Residential] Loans[.]

In pertinent part in Instruction 18, the jury was instructed that if it found against Homecomings:

> You must award plaintiffs' class such sum as you believe will fairly and justly compensate plaintiffs' class for any of the ... damages set forth below that you believe plaintiffs' class sustained as a result of the conduct of defendant [Homecomings]:
>
> ....

> The total amount of any interest paid by plaintiffs' class in connection with the [Residential] Loans[.]

In Verdict A, the jury awarded $3,414,962 of past interest against Residential. In Verdict B, the jury awarded $682,992 of past interest against Homecomings for the Residential Loans.

Plaintiffs argue that the undisputed evidence showed that $3,414,962 of interest had been paid in connection with the Residential loans. They contend that in addition to the $3,414,962 against Residential, they should receive $3,414,962 against Homecomings because Instruction 18 told the jury to "fairly and justly compensate plaintiff for the total amount of any interest paid in connection with the Residential loans."

 A plaintiff must be fully compensated for past or present injuries caused by the defendant when the injuries have been proven by a preponderance of the evidence. *Wiley v. Homfeld,* 307 S.W.3d 145, 153 (Mo.App. W.D.2009). A court may increase the size of a jury's verdict if it finds the award inadequate because it "is less than fair and reasonable compensation for the plaintiff's injuries and damages." *Massman Constr. Co. v. Mo. Highway & Transp. Comm'n,* 914

S.W.2d 801, 802 (Mo. banc 1996) (quoting § 537.068).

■ In Instruction 18, the jury was required to compensate "plaintiffs' class for *any* of the damages ... sustained *as a result of the conduct* of defendant Homecomings." (Emphasis added.) Plaintiffs misinterpret the word "any" to mean "all" and also circumvent the phrase "as a result of the conduct" of Homecomings. Verdict A and Verdict B assessed fault for different parties. We review a jury instruction in its entirety, rather than in its parts. *McClintock v. Price*, 294 S.W.2d 643, 645 (Mo.App. E.D.1956). Viewing the instructions in their entirety, the jury was not required to enter the same award in Verdict B against Homecomings as it entered in Verdict A against Residential but, rather, the portion of the damages attributable to Homecomings' conduct.

Since "any" damages does not mean "all," the jury was entitled to award between $0 and $3,414,962, the full amount of the past interest on the Residential loans. As Plaintiffs' counsel argued to the jury: "Homecomings ... didn't have anything to do with the fees. They just collected the interest." The jury assessed Homecomings' liability at twenty percent of $3,414,962, which was $682,992.[29] Consequently, the jury acted within its province. Plaintiffs' first point on cross-appeal is denied.

### P–2: Plaintiffs' Cross–Appeal: Denial of Prejudgment Interest on Past Interest Paid

■ In their second point on cross-appeal, Plaintiffs contend that the trial court erred in denying prejudgment interest on their past interest award because they were entitled to such compensation under section 408.020. Relying on *Catron v. Columbia Mut. Ins. Co.*, 723 S.W.2d 5, 7 (Mo. banc 1987), under "principles of equity, fairness, and justice," the trial court awarded Plaintiffs prejudgment interest on the illegal fees assessed only, calculated from the date of the note. It denied Plaintiffs request for prejudgment interest on the interest paid on the loans, reasoning that Plaintiffs were awarded the interest and that the "principles of equity do not support an award of prejudgment interest on the past interest paid."

■ There are two theories under which Missouri courts award prejudgment interest. *Akers v. City of Oak Grove*, 246 S.W.3d 916, 922 (Mo. banc 2008).

> One theory provides that an allowance of interest must be based upon either a statute or a contract, express or implied; except for actions in equity, in which case, it is a matter for the trial court's discretion. A second theory recognizes interest as an element of damages necessary to return plaintiffs to the status quo, compensating plaintiffs for the loss of use of money to which they were entitled.

*Id.* (internal citation omitted). The two theories are resolved "to some extent" by liberally interpreting the statutes that authorize recovery of prejudgment interest. *Id.*

■ We review the statutory right to prejudgment interest pursuant to section 408.020 *de novo*. *Children Int'l. v. Ammon Painting Co.*, 215 S.W.3d 194, 202 (Mo.App. W.D.2006). "Determination of the right to prejudgment interest is reviewed de novo because it is primarily a question of statutory interpretation and its

---

**29.** We note that during deliberation, the jury requested to know the percent Homecomings collected as its fees. The jury also awarded Plaintiffs twenty percent of the amount of future interest it assessed against Residential.

application to undisputed facts." *Id.* We review the trial court's failure to award prejudgment interest under equitable principals for abuse of discretion. *See Carpenter*, 250 S.W.3d at 704.

Section 408.020 requires an award of prejudgment interest when a claim is either liquidated or ascertainable by computation or recognizable standards. *Children Int'l*, 215 S.W.3d at 203. "Awards of prejudgment interest are not discretionary; if the statute applies, the court must award prejudgment interest." *Id.* Section 408.020 mandates that:

> *Creditors shall be allowed to receive interest* at the rate of nine percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made; for money recovered for the use of another, and retained without the owner's knowledge of the receipt, and for all other money due or to become due for the forbearance of payment whereof an express promise to pay interest has been made.

(emphasis added).

Plaintiffs sought prejudgment interest on the illegal loan fees and past interest paid on the loans under, *inter alia*, the first provision of section 408.020: "for all moneys after they become due and payable, on written contracts." We agree that Plaintiffs claim for pre-judgment interest on the past interest paid was authorized by this provision. "The term 'creditor' ... includes ... every one having a ... legal right to damages growing out of contract or tort." BLACK'S LAW DICTIONARY 368 (6th ed.1990). Section 408.236 barred Defendants from recovering interest on the loans; Plaintiffs consequently had a "legal right" to the unlawfully obtained interest as damages. When section 408.020 is ap-

plicable, an award of prejudgment interest is not discretionary; it is compelled. *Hawk Isolutions Group, Inc. v. Morris*, 288 S.W.3d 758, 762 (Mo.App. E.D.2009). Plaintiffs were consequently entitled to prejudgment interest on the interest paid.

■ Plaintiffs claim for pre-judgment interest is further buttressed by principles of equity and the policy behind prejudgment interest. The purpose of prejudgment interest is to fully compensate the plaintiffs for the time-value of money. *Children Int'l*, 215 S.W.3d at 203. Prejudgment interest also serves to promote settlement and deter unnecessary delay in litigation. *Catron*, 723 S.W.2d at 8. Interest is awarded for the obligor's failure to pay money when payment is due, "even though the obligor refuses payment because the obligor questions legal liability for all or portions of the claim." *Midwest Division–OPRMC, LLC v. Department of Soc. Svcs., Div. of Med. Svcs.*, 241 S.W.3d 371, 384 (Mo.App. W.D.2007). If the failure to pay money when due results in liability for prejudgment interest, it logically follows that interest is due on monies wrongfully collected. Defendants had use of the interest paid by plaintiffs, thereby denying plaintiffs the time-value of the money that section 408.236 barred Defendants from collecting. To grant prejudgment interest on the unlawful fees and to deny prejudgment interest on the unlawful interest gave Plaintiffs an incomplete remedy. *Compare Carpenter*, 250 S.W.3d at 704–05 (holding that because award of treble damages accomplished penalizing purpose of statute and plaintiffs recovered much more than their actual damages and interest on that amount, plaintiffs were not entitled to prejudgment interest on the treble damages).

Plaintiffs' second point on cross-appeal is granted. Plaintiffs are entitled to prejudgment interest on each of the interest

payments from the date each payment was received by the Defendants. The parties offered conflicting calculations as to this amount and the apportionment between the Defendants; because the trial court denied prejudgment interest on the interest payments, the trial court made no factual findings on these issues. Therefore, we reverse the denial of prejudgment interest on Plaintiffs' interest payments and remand to the trial court for determination and judgment entered accordingly.

### Submissibility of Punitive Damages

*8: Plaintiffs Showed Culpability for Punitive Damages*

In the eighth issue on appeal, Assignee Defendants argue that the trial court erred in denying their motions for directed verdict and JNOV because Plaintiffs failed to make a submissible case that Assignee Defendants' conduct reflected the culpability necessary to justify punitive damages.

Whether the evidence was sufficient to submit a punitive damages claim to the jury is an issue we review *de novo*. *Rinehart v. Shelter Gen. Ins. Co.*, 261 S.W.3d 583, 595 (Mo.App. W.D.2008). A submissible case for punitive damages is made if "the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity-that is, that it was highly probable-that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Topper v. Midwest Div., Inc.*, 306 S.W.3d 117, 132 (Mo.App. W.D.2010) (internal quotation marks and citation omitted). We view the evidence in the light most favorable to the plaintiff, draw all reasonable inferences in favor of submission, and disregard contrary evidence and inferences. *Rinehart*, 261 S.W.3d at 595. "It is only where there is a complete ab-

sence of probative fact to support the jury's conclusion that this Court will decide the plaintiff did not make a submissible case." *Id.* (internal citation and quotations omitted).

Assignee Defendants contest the submission of punitive damages because, they argue, (1) Plaintiffs were not harmed by their failure to check for state law compliance because, had they checked, they simply would not have bought the loans, and (2) Plaintiffs adduced no evidence that Assignee Defendants acted with a culpable mental state in that they did not prove Defendants knew the loans violated state law. We do not agree with either proposition.

Plaintiffs' theory of punitive damages was that Defendants acted with reckless disregard for Plaintiffs' rights as Missouri consumers. In arguing for punitive damages, Plaintiffs contended that the Assignee Defendants' agreements with MCR gave them the right to require MCR to offer proof of state law compliance, yet Assignee Defendants never made that request. However, when Assignee Defendants' own interests were at stake, they diligently inspected the loans' compliance, refusing to rely on MCR's representations and warranties. For example, Assignee Defendants independently verified the loans' compliance with federal TILA disclosure requirements; failure to follow those requirements would have given the borrowers a right of rescission. Plaintiffs argued that it would have been a simple matter for Assignee Defendants to check the loans' compliance with state law and presented evidence that in the industry, a matrix of state laws on fees could be as short as a one-page spreadsheet. Plaintiffs also presented evidence to show that state law compliance by other lenders could be managed through quality control programs. Plaintiffs argued that, instead,

Defendants turned a blind eye (1) "Because they didn't care. Because it didn't affect them" and (2) their business model benefited from the illegal fees.

Plaintiffs were not required to prove Assignee Defendants "knew" the loans violated Missouri law. Rather, Plaintiffs' evidence and theory were sufficient for the jury to find Assignee Defendants acted with reckless disregard for Plaintiffs rights and to infer evil motive, i.e. a culpable mental state. *See id.* at 132. Consequently, Residential's tenth point, Household's twelfth point, and Wachovia's thirteenth point are denied.

### 9: Punitives: Defendants Had Notice of the MSMLA's Requirements

■ In the ninth issue, Assignee Defendants contend that the trial court erred in denying their motions for directed verdict and JNOV because they lacked notice that their conduct could subject them to punitive damages. They argue that the bases for their liability to Plaintiffs rested on "novel and unforeseeable" interpretations of Missouri law. They allege that no court had ever held that: (1) the charges in section 408.233.1(3) of the SMLA were exclusive; (2) HOEPA requires a lender to check loans it purchases for state law compliance; (3) *Adkison* and *Avila* were inapplicable to Plaintiffs' loans; and (4) a lender could be liable for "indirectly" charging unlawful fees or recovering interest.

■ Fair notice of proscribed conduct is required for punitive damages. *See Carpenter,* 250 S.W.3d at 702. This is because due process requires a person "receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

We do not agree that Defendants lacked fair notice. First, section 408.233 unambiguously allowed Defendants to charge otherwise usurious interest in exchange for following its prohibition against unauthorized fees. Defendants relied on this provision yet failed to check as to whether the fees complied with Missouri law. Their defense at trial was that it was industry practice to ignore the applicable law—yet on appeal Defendants argue that they lacked fair notice of that same law. "It will not be contended that ignorance of [a] statutory provision will excuse its violation ..." *State v. Welch,* 73 Mo. 284, 287 (1880). Moreover, we do not believe Defendants established that the statute failed to provide notice as to its meaning. This is not a case, such as in *BMW,* where a defendant was relying on a reasonable interpretation of the law. Rather, Defendants were ignoring any responsibility to comply with Missouri law. Certainly, the conscious disregard of an obligation by the industry as a whole is not a defense.

Second, Assignee Defendants' liability as MCR's assignees under HOEPA is undisputed. It is disingenuous for Assignee Defendants to argue they were unaware they were obligated to check for state law compliance if they wished to protect themselves from liability for MCR's violations.

Third, we do not agree that "fair notice" required a court to hold *Adkison* and *Avila* did not authorize Defendants to charge unlimited interest in Missouri. *Adkinson's* reasoning plainly depended on federal interstate banking law and could not reasonably be interpreted to allow a mortgage broker to charge unlimited interest and fees. *See* discussion of issue one, *supra.*

And fourth, the language of section 408.233 plainly states, "[n]o charge other than that permitted by section 408.232 shall be directly or indirectly charged, con-

tracted for or received in connection with any second mortgage loan, except as provided in this section." Section 408.236 directly states, "[a]ny person violating the provisions of sections 408.231 to 408.241 shall be barred from recovery of any interest on the contract." *See, e.g.,* 1 Steven M. Geary, *Finance Law, Missouri*, CONSUMER LAW AND PRACTICE § 2.14 (MoBar Supp. 1995) (informing practitioners that section 408.236 provides that "[a]n overcharge of interest or points results in a zero-interest contract unless the overcharge is a result of a bona fide error in computation.").

Section 408.240 provides for criminal penalty for violating these provisions. Section 408.562 plainly authorizes a private right of action for violation of these provisions and punitive damages "[i]n addition to any other civil remedies or penalties provided by law." As the MSMLA states these terms in unambiguous language, Assignee Defendants have failed to show they lacked "fair notice" that they could be subjected to punitive damages for illegal loan practices. Residential and Homecomings' eleventh point, Household's fourteenth point, and Wachovia's fourteenth point are denied.

### 10: Punitive Damages Were Not Redundant

In the tenth issue, Assignee Defendants argue that a punitive damage award is "unfairly redundant and duplicative." The purpose of punitive damages is to punish the defendant for outrageous conduct and to deter others from similar conduct. *Burnett v. Griffith*, 769 S.W.2d 780, 787 (Mo. banc 1989). They argue that because Plaintiffs were awarded the past and future interest on their loans, sufficient penalty was already imposed to serve the purposes of punishment and deterrence.

We disagree. Plaintiffs' damages award of past and future interest was authorized by section 408.236, which provides that defendants who violate the SMLA's fee limitations are "barred from recovery of any interest on the contract." As discussed *supra*, this provision bans defendants from profiting from their unlawful acts by collecting interest on unlawful loans. By disallowing a defendant to collect interest on a loan with illegal terms, the section prevents the defendant from profiting by the illegal loan. In particular, it bars the defendant from collecting the otherwise unlawful interest. While a statute may impose a penalty, this is not synonymous with the imposition of punitive damages. *Carpenter*, 250 S.W.3d at 702. Punitive damages differ in that they are "extraordinary and harsh." *Hess*, 220 S.W.3d at 771 (internal quotation marks and citation omitted). Moreover, punitive damages require a showing that the defendant acted wantonly, willfully, or with a reckless disregard for the consequences, such that a culpable mental state may be inferred. *Burnett*, 769 S.W.2d at 787. Section 408.236's ban does not require a culpable mental state. Consequently, we do not believe merely barring the defendant from recovering interest is duplicative of punitive damages.

Further, the Missouri Legislature has "wide latitude to decide the severity of civil penalties for violations of law." *State v. Spilton*, 315 S.W.3d 350, 358 (Mo. banc 2010). The legislature is consequently free to allow or disallow punitive damages. *Scott v. Blue Springs Ford Sales, Inc.*, 176 S.W.3d 140, 142 (Mo. banc 2005). In section 408.562 the legislature authorized actual damages, punitive damages, attorney fees, and equitable relief "[i]n addition to any other civil remedies or penalties provided for by law." Because the damages are not duplicative and because the Mis-

souri Legislature both barred lenders from recovering interest on illegal loans and expressly authorized punitive damages in addition to other remedies, Residential and Homecomings' twelfth point and Wachovia's fifteenth point are denied.

### 11: Punitives: the Disjunctive Instruction Was in Error.

 In the eleventh issue on appeal, Assignee Defendants argue that they are entitled to remittitur because HOEPA caps the amount of damages that may be awarded in any action "made permissible" by HOEPA. 15 U.S.C. § 1641(d)(2). Although title 15 U.S.C. § 1641(d)(1) creates assignee liability for purchasers of HOEPA loans (with exceptions), the consumer's damages against the assignee are capped.[30] *See* 15 U.S.C. § 1641(d)(2); *see also In re Murray*, 239 B.R. 728, 735 (Bankr.E.D.Pa. 1999). This functions "to prevent a consumer's receiving [a] windfall due to the status of a violations victim." *In re Murray*, 239 B.R. at 735. The section "caps" the amount of damages a plaintiff may receive in an action "made permissible" by HOEPA to the total of the amount still owed by the plaintiff and the amount paid by the plaintiff "in connection with the transaction." 15 U.S.C. § 1641(d)(2). Assignee Defendants argue that Plaintiffs' punitive damages award was thus in error.

 Where the jury is instructed in the alternative or the disjunctive on two grounds of liability, there must be a submissible case for both submissions. *Mabe*

*ex rel. Magnuson v. Kelsey–Hayes Co.*, 844 S.W.2d 448, 456 (Mo.App. W.D.1992); *see also Rakestraw v. Norris*, 478 S.W.2d 409, 416 (Mo.App.1972). This is because it is impossible to determine after the fact whether the jury's finding was made on the legally valid, or legally invalid, ground. The jury was instructed to award punitive damages: (1) if it believed the conduct of Assignee Defendants "as submitted in [the partial directed verdict] was outrageous because of [Assignee Defendants'] evil motive or reckless indifference to the rights of others"; or (2) if it found the same culpability for Assignee Defendants' own violations of the MSMLA. The mental state element in the first alternative is somewhat unclear as to whether the jury was to hold Assignee Defendants derivatively liable for MCR's culpable mental state or for their own mental state. Disregarding that ambiguity, we believe the jury was instructed in the alternative to award punitive damages either because: (1) Assignee Defendants were liable for MCR's conduct—which, because we have found no "common law assignee liability" applicable here would necessitate assignee liability through HOEPA; or (2) because Defendants were liable for their own culpability in their own acts violating the MSMLA.

Punitive damages for Assignee Defendants' own conduct could be submitted to the jury on independent state law grounds. HOEPA does not preempt state law claims. *See McCrae v. Com. Credit Corp.*,

---

**30.** Title 15 U.S.C. § 1641(d)(2) provides that: Notwithstanding any other provision of law, relief provided as a result of any action made permissible by paragraph (1) may not exceed—
(A) with respect to actions based upon a violation of this subchapter, the amount specified in section 1640 of this title; and
(B) with respect to all other causes of action, the sum of—

(i) the amount of all remaining indebtedness; and
(ii) the total amount paid by the consumer in connection with the transaction.
The trial court found that this provision did not cap damages because it states that the relief "may not exceed" rather than "shall not exceed." In the statutory context, we do not agree that the provision is permissive; the case law indicates otherwise.

892 F.Supp. 1385, 1386–87 (M.D.Ala.1995). 15 U.S.C. § 1610(b) provides that HOEPA "does not otherwise annul, alter or affect in any manner the meaning, scope or applicability of the laws of any State." This includes, but is not limited to:

> laws relating to the types, amounts or rates of charges, or any element or elements of charges, permissible under such laws in connection with the extension or use of credit, nor does this subchapter extend the applicability of those laws to any class of persons or transactions to which they would not otherwise apply.

15 U.S.C. § 1610(b). Because Plaintiffs' theory that Defendants were directly liable for their own violations of state law relied on the MSMLA, rather than HOEPA assignee liability, it was not "made permissible" by HOEPA. Consequently, HOEPA would not "cap" a claim that Defendants themselves violated the MSMLA.

However, to the extent Defendants' liability depends on HOEPA assignee liability, it is subject to the cap within 15 U.S.C. § 1641(d)(2). Because we have found no "common law assignee liability" in Missouri for one who does no more than purchase a loan, if the jury awarded damages based on the partial directed verdict of assignee liability, it would necessarily be an action "made permissible by HOEPA" and the "damages cap" in HOEPA would apply. *See* 15 U.S.C. § 1641(d)(2). Consequently, the jury could not properly be instructed to award punitive damages based on assignee liability.

While the second theory of punitive damages on which the jury was instructed would support the verdict,[31] the first theory would not allow the verdict to stand. Here, it is impossible to ascertain whether the jury awarded punitive damages based on the erroneous theory of Assignee Defendants' common law liability for MCR's conduct, or the correct theory of Assignee Defendants' liability for their own conduct in violating the MSMLA. As a result, the punitive damages award must be reversed and remanded for retrial. Residential and Homecomings' eighth point, Household's sixteenth point, and Wachovia's eleventh point are granted.[32]

## Motions on Appeal

■■■ Plaintiffs request attorney fees incurred in the appeal under section 408.562. That section provides in pertinent part: "The court may, in its discretion ... award to the prevailing party in such action attorney's fees, based on the amount of time reasonably expended...." § 408.562. The "prevailing party" is the party "who successfully prosecutes the action or successfully defends against it, prevailing on the main issue, even though not necessarily to the extent of its original contention." *Paradise v. Midwest Asphalt Coatings, Inc.*, 316 S.W.3d 327, 330 (Mo.App. W.D.2010) (internal quotation marks and citation omitted). Here, because we have affirmed Defendants' liability for compensatory damages, we find Plaintiffs are the prevailing party on appeal. In our discretion, we grant Plaintiffs' motion for attorney fees on appeal and remand to the trial court to determine an amount "based on the amount of time reasonably expended."[33]

---

**31.** Section 408.562 authorizes punitive damages for violation of the MSMLA.

**32.** We do not remit the award because punitive damages could properly be awarded on the second theory. Because we remand the punitive damages award for re-trial, we do not address Defendants' other points related to the punitive damages award.

**33.** Plaintiffs' other motions on appeal are denied.

## Conclusion

We affirm the trial court's entry of judgment as to compensatory damages; reverse and remand its denial of prejudgment interest on Plaintiffs' past interest payments; reverse the punitive damages award for instructional error, and remand for a new trial as to punitive damages. Plaintiffs' motion for attorney fees on appeal is granted and remanded to the trial court to determine a reasonable amount.

WITT, J., and WILLCOX, Sp. J. concur.